**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ANDREW FISCHER,<br><br>                    **Plaintiff,**<br><br>         **v.**<br><br>PEPPER HAMILTON LLP,<br><br>                    **Defendant.** | **CIVIL ACTION**<br>**NO. 15-02413** |

**PAPPERT, J.**                                                          **January 29, 2016**

<u>MEMORANDUM</u>

Plaintiff Andrew Fischer ("Fischer") sued Defendant Pepper Hamilton, LLP ("Pepper"), alleging discrimination and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 *et seq.* Fischer's discrimination claims include both failure to accommodate and disparate treatment theories. Fischer's retaliation claim alleges Pepper retaliated against him for complaining of disability discrimination and requesting accommodations. Pepper moves for summary judgment on all of Fischer's claims. For the reasons that follow, Pepper's motion is granted in part and denied in part.

**I.**

Pepper is a full-service law firm headquartered in Philadelphia. (Def.'s Statement of Facts ("Def.'s SMF") ¶ 1; Pl.'s Counterstatement of Facts ("Pl.'s SMF") ¶ 1.) In August 2006, Pepper hired Fischer as a project attorney in its Health Effects Group. (Def.'s SMF ¶ 17; Pl.'s SMF ¶ 17.) Pepper's Health Effects Group represents pharmaceutical and medical device companies in complex litigation and investigations. (Def.'s SMF ¶ 2; Pl.'s SMF ¶ 2.) Project attorneys are at will employees who are hired to work for specific litigation related projects.

(Def.'s SMF ¶¶ 5–6; Pl.'s SMF ¶¶ 5–6.)  Once a specific project ends, Pepper tries to find other assignments for its project attorneys within the Health Effects Group.  (Def.'s SMF ¶ 11; Pl.'s SMF ¶ 11.)

As a project attorney, Fischer's job was to "[c]ome in and work on the projects [he] was assigned to."  (Fischer Dep. 64:7–9.)  Fischer received assignments from, and provided work product to, case team associates and partners within the Health Effects Group.  (Hamilton Dep. 24:5–8; Fischer Dep. 66:17–22.)  In determining how many project attorneys to staff on a particular project, Pepper used a "pages per lawyer working full-time per day calculation." (Hamilton Dep. 42:15–18.)  Completing these projects in a timely fashion was important to Pepper's clients.  (*Id*. 24:14–18.)  Most projects to which Fischer was assigned included reviewing documents, contracts and settlement agreements.  (Fischer Dep. 64:11–16.)  Fischer accessed these documents both online and in hard copy.  (*Id*. 65:24–66:1.)  Project attorneys rarely interacted with clients, but did however work in teams and participate in team meetings at work.  (Fischer Dep. 108:1–12; Hamilton Dep. 45:9–12.)

Project attorneys who worked an eight hour day were required to account for a minimum of one hour of breaks including lunch; for those who worked less than an eight hour day, Pepper asked that the total recorded break time be proportional to the work completed.  (Hamilton Dep. 38:15–39:1.)  The rationale behind Pepper's mandatory break policy was to alleviate client concerns that could arise if the client saw an attorney billing nine straight hours without any breaks.  (*Id*. 39:22–40:9.)

At all relevant times, Matthew Hamilton ("Hamilton") was Fischer's acting supervisor. (Def.'s SMF ¶ 18; Pl.'s SMF ¶ 18.)  Hamilton was of counsel at Pepper and supervised anywhere from 50 to 70 project attorneys.  (Def.'s SMF ¶¶ 3–4; Pl.'s SMF ¶¶ 3–4.)  On October 9, 2007,

Hamilton emailed a number of project attorneys, including Fischer, stating: "Despite my repeated reminders and warnings, you continue to report to work <u>long</u> after 9:00 am on a regular basis.  This is a long-standing and non-negotiable condition of your assignment here at Pepper.  Please bring your attendance into compliance immediately."  (Def.'s SMF ¶ 20; Pl.'s SMF ¶ 20; Def.'s Mot. Summ. J. at Ex. 1(P-6).)  Fischer told Hamilton he was going to miss four to five hours on October 17 for a "sleep evaluation" with his neurologist.  (Def.'s Mot. Summ. J. at Ex. 1(P-6).)  He also told Hamilton he would "do [his] best to comply with the Business Hours requirement."  (*Id.*)  Hamilton responded: "If it's a health issue then that's not a problem at all," but "when you are back in good health, there should be no 'trying' to comply[] [as] the requirement is there to make sure that we have people ready to respond to client needs."  (*Id.*)

In August 2008, Pepper hired Nadine Overton ("Overton") to assist Hamilton in reviewing time sheets and supervising the other project attorneys.  (Def.'s SMF ¶ 23; Pl.'s SMF ¶ 23.)  On December 2, 2008, Overton emailed Fischer asking why he was routinely showing up for work after 1:10 p.m.  (Def.'s SMF ¶ 24; Pl.'s SMF ¶ 24; Def.'s Mot. Summ. J. at Ex. 1(P-7).)  Fischer told Overton he was diagnosed with Delayed Sleep Phase Syndrome ("DSPS")[1] in October 2007.  (Def.'s Mot. Summ. J. at Ex. 1(P-7).)  Hamilton then asked Fischer for a doctor's note providing "specific details as to limitations and [] terms of duration."  (*Id.*)

On January 15, 2009, Hamilton emailed Fischer noting that he "[was] still coming in late most days and [was] not sending emails to memorialize that fact."  (Def.'s SMF ¶ 28; Pl.'s SMF ¶ 28; Def.'s Mot. Summ. J. at Ex. 1(P-9).)  Hamilton also asked Fischer about the doctor's note requested by Overton back in December.  (Def.'s Mot. Summ. J. at Ex. 1(P-9).)  Fischer told

---

[1]      "Delayed sleep phase is an internal sleep clock (circadian rhythm) sleep disorder in which your sleep pattern is delayed two hours or more from a normal sleep pattern, causing you to go to sleep later and wake up later."  Mayo Clinic Staff, *Delayed Sleep Phase Disorder*, http://www.mayoclinic.org/diseases-conditions/delayed-sleep-phase/basics/definition/con-20035242 (last visited January 28th, 2016).

Hamilton he had scheduled an appointment with a neurologist for January 20, 2009 and would

try to "get something more precise" for his DSPS.  (*Id.*)  Fischer directed Hamilton to the DSPS

Wikipedia[2] article for more information.  (*Id.*)  On January 24, 2009, Hamilton sent the

following email to all project attorneys:

> Please continue to carefully monitor your time to ensure you are adhering to the
> 10 hours per day maximum billing cap between the hours of 7 am through 7 pm,
> with core hours between 9 am and 5 pm.  Further, please note that, effective
> immediately, each reviewer may bill up to a maximum of 200 hours per month.
> Exceptions will be granted on an individual basis based upon the needs of each
> assignment.

(Def.'s Mot. Summ. J. at Ex. 7(A); Pl.'s Resp. to Def.'s Mot. Summ. J. ("Pl.'s Resp.") at Ex. C.)

Pepper implemented this policy in 2008 after an issue arose with a former contract attorney who

was billing for time when he was neither present nor working.  (Def.'s SMF ¶ 13; Pl.'s SMF ¶

13.)  Hamilton testified that the requirement was put in place to ensure that employees were not

billing for work unsupervised.  (Hamilton Dep. 47:11–13.)

In March 2009—three months after Overton's initial request—Fischer provided Pepper

with a note from Dr. Albert Wagman ("Dr. Wagman").  (Def.'s SMF ¶ 31; Pl.'s SMF ¶ 31;

Def.'s Mot. Summ. J. at Ex. 1(P-11).)  Dr. Wagman stated: "[Fischer] has a somewhat unusual

condition in which the normal sleepiness time is delayed so that these patients typically do not

fall asleep until later in the night than the average person and, as a consequence, are later in

getting up in the morning."  (Def.'s Mot. Summ. J. at Ex. 1(P-11).)  Dr. Wagman said that "the

condition can be ameliorated at least in part by the use of medication which I discussed with the

patient."  (*Id.*)  The note lacked any specific time by which Fischer could be expected to arrive at

work.  (*Id.*)

---

[2]        "Wikipedia is a free encyclopedia, written collaboratively by the people who use it.  It is a special type of
website designed to make collaboration easy, called a wiki.  Many people are constantly improving Wikipedia,
making thousands of changes per hour."  Wikipedia, *Introduction: What is Wikipedia*,
https://en.wikipedia.org/wiki/Wikipedia:Introduction (last visited January 28th, 2016)

In response to Dr. Wagman's note, Hamilton emailed Fischer on March 17, 2009, stating: "I'm happy to have you start later in the day if necessary (although the 'early' part of the [doctor's] note is somewhat vague and might not support a start as late as noon)."  (Def.'s SMF ¶ 32; Pl.'s SMF ¶ 32; Def.'s Mot. Summ. J. at Ex. 1(P-12).)  However, Hamilton informed Fischer that Pepper would not "keep the review open . . . past our normal closing time of 7 pm."  (Def.'s Mot. Summ. J. at Ex. 1(P-12).)  From March 17, 2009 to December 29, 2009, Fischer arrived after 12:00 p.m. and left around 7:00 p.m. on a vast majority of the days he worked.  (Pl.'s Resp. at Ex. A.)

In December 2009, Hamilton authorized Fischer to work past 7:00 p.m.  (Def.'s Mot. Summ. J. at Ex. 1(P-15); Pl.'s Resp. at Ex. E; Fischer Dep. 153:4–13.)  Hamilton provided: "Going forward you may work up until 8:30 where necessary, but you should try and work as close to 7 pm as you can to minimize the amount of time billed outside regular hours."  (Def.'s Mot. Summ. J. at Ex. 1(P-15); Pl.'s Resp. at Ex. E.)  Fischer thanked Hamilton for the adjustment.  (Def.'s Mot. Summ. J. at Ex. 1(P-15); Pl.'s Resp. at Ex. E; Fischer Dep. 153:4–13.) From December 29, 2009 to October 21, 2011, Fischer worked until 8:30 p.m. nearly every single workday, but only averaged 29.1 hours per week.  (Pl.'s Resp. at Ex. A.)

On October 21, 2011, Overton's successor, Brian Cleghorn ("Cleghorn"), emailed Fischer and informed him that the project he was working on did not "necessitate the need for work outside core closing hours – 7 pm."  (Def.'s Mot. Summ. J. at Ex. 1(P-15); Pl.'s Resp. at Ex. G.)  At that time, Cleghorn did not know about Fischer's disability or schedule adjustments. (Cleghorn Dep. 20:3–12.)  Fischer responded and attached Hamilton's December 2009 email allowing work up to 8:30 p.m. where necessary.  (Def.'s Mot. Summ. J. at Ex. 1(P-15); Pl.'s Resp. at Ex. G.)  Fischer expressed that "my understanding of the email . . . was that 'necessary'

for me was effectively every day.  That's certainly how I viewed the email for the last **21+ months**, using 8:30 PM as my usual departure time."  (Def.'s Mot. Summ. J. at Ex. 1(P-15); Pl.'s Resp. at Ex. G.)  Fischer told Overton, "you seem to be reading new meanings into [Hamilton's] email that no one else has in the nearly two years since he sent it."  (*Id*.)

Hamilton, who was copied on Fischer's email, responded to Fischer that night.  (*Id*.) Hamilton stated:

> I read in my email the direction that while work after 7 pm is authorized, every effort should be made to avoid late nights so that it becomes the exception rather than the rule.  If your practice has been to work till [sic] 8:30 pm every night then that would not be what I originally contemplated . . . . I would ask that you abide by what I believe was the spirit of the original accommodation – the occasional late night is ok, but its [sic] certainly not carte-blanche to work late every single night.

(*Id*.)  Three days later, Fischer emailed Hamilton regarding a meeting that occurred between Fischer and Cleghorn.  Fischer stated that Cleghorn "made it very clear to me that he did not want to deal with the 'hassle' of other people on the project requesting to stay past 7 PM if I continued to be allowed to do so."  (Pl.'s Resp. at Ex. F.)  According to Fischer, the meeting was "off-the-wall, to put it mildly."  (*Id*.)  Fischer noted that Cleghorn "basically laughed at me for having a disability ('<laughter> Those meetings are in the morning.  <laughter>  You're not going to them.  <hearty laughter>')."  (*Id*.)  Fischer expressed his frustration and told Hamilton that "Cleghorn's conduct towards me has been extremely unprofessional and troubling."  (*Id*.) Fischer also added that "[t]he cost to Pepper of the accommodations that I requested is truly *de minimis*."  (*Id*.)

Hamilton responded to Fischer by referring him to the original and subsequent emails regarding the expectation that Fischer work up to 8:30 p.m. where necessary.  (*Id*.)  He also stated that he would speak to both Fischer and Cleghorn when he returned from New York later

that day.  (*Id.*)  Hamilton called Cleghorn and asked whether he had in any way disrespected

Fischer.  (Cleghorn Dep. 42:17–24.)  Cleghorn told Hamilton that he had not.  (*Id.*)

In January 2012, Fischer asked if he could work for the Intellectual Property ("IP")

Practice Group after 7:00 p.m.  (Def.'s SMF ¶ 44; Pl.'s SMF ¶ 44; Def.'s Mot. Summ. J. at Ex.

1(P-17).)  Hamilton responded to Fischer's request on January 31, 2012, stating:

> My concern with adding the IP work is that your hours on the GSK side are fairly
> low, so low in fact that the settlement folks assumed you were working part-time
> for me as well, and so I have a concern that additional assignments would further
> decrease your availability to Ken's group who very much appreciates your work.

(Def.'s Mot. Summ. J. at Ex. 1(P-17).)  Hamilton also asked Fischer about the status of another

doctor's note the two had previously discussed.  (*Id.*)  Fischer responded the next day, notifying

Hamilton that "[m]y doctor wanted to hold-off writing a letter to HR until he could ascertain how

I would respond to some other medications."  (*Id.*)  Fischer then told Hamilton about a meeting

he had with Ray Miller ("Miller") in the IP department.  (*Id.*)  Fischer stated:

> Ray Miller . . . indicated that he was amenable to my staying past 7 PM to work
> on IP matters (and he liked the idea of having someone in IP working late in case
> anything came-up [sic] after normal hours) . . . .  Since I currently can't bill after 7
> PM, in an attempt to maximize my hours I end-up [sic] arriving later than I might
> otherwise.  If I could bill IP work after 7 PM then I could focus on a more
> attainable 12 PM or 12:30 PM arrival time . . . .  What I might suggest is for me to
> spend approximately 5 hours a day on Health Effects (which is probably a bit
> more than I'm spending now) and the balance of my time on IP projects.  From
> 12:30 PM to 7 PM would allow me 5 hours (plus mandatory break time) to work
> on GSK plus almost an hour to receive, discuss, and review my IP assignment for
> the evening . . . .  Spending about 5 hours a day on Health Effects and the balance
> of my time on IP should make a full time schedule.

(*Id.*)  Fischer presented Pepper with a note from Dr. Michael Turk ("Dr. Turk") dated February

26, 2012.  (Def.'s SMF ¶ 47; Pl.'s SMF ¶ 47; Def.'s Mot. Summ. J. at Ex. 1(P-4); Pl.'s Resp. at

Ex. H.)  Dr. Turk stated that Fischer's "disorders cause him to have distributed sleep with

inability to fall asleep before 2 AM.  His disorders require him to obtain 8 hours of sleep to have

normal functioning, thus he is waking up at 10 AM at the earliest." (Def.'s Mot. Summ. J. at Ex. 1(P-4); Pl.'s Resp. at Ex. H.)  Dr. Turk observed that "[g]iven the time it takes to get to work, Andrew is likely to arrive between 11:30 AM and 1 PM." (*Id.*)  He also stated that "Andrew is seeking to have his work day be from noon to 9pm with time for a meal break given his sleep schedule." (*Id.*)

On March 13, 2012, Fischer emailed Hamilton and told him Dr. Turk's note indicated a target workday of noon to 9:00 p.m. (Def.'s SMF ¶ 48; Pl.'s SMF ¶ 48; Def.'s Mot. Summ. J. at Ex. 1(P-18).)  Fischer then stated:

> In the interim, it would seem that a 1 pm to 10 pm workday for me would be analogous to 8 am to 5 pm for most of the team (with my "9-5 core business hours" being something like 2 pm to 10 pm, and a daily 12-hour billing range from noon to midnight) . . . . Also, would you please let me know the status of my request for approval to work on IP projects (and if there's anything else that I need to do to be approved to do some IP work).

(Def.'s Mot. Summ. J. at Ex. 1(P-18).)  Hamilton responded an hour later, saying:

> My understanding is that your doctor's note states that you are seeking a work day of noon to 9 pm.  Since you were previously working until 8 pm, I think it's a reasonable accommodation, starting, immediately, to permit you to continue working until 8 pm.  Similarly, you will be permitted to start work later than the 9 am core hour requirement, provided you let . . . Cleghorn know if you are going to arrive later than noon.  With respect to your request to work for the IP department, given recent increasing demands on the team, including several parallel priority projects that have drawn resources from existing projects, I can no longer make a sufficiently compelling case for you to divide your efforts on non-Health Effects work at this time.  You are free, of course, to resign your position in order to work for the IP department exclusively, but that is your call.

(*Id.*)  Fischer emailed an attorney in the IP department, Michael Patane ("Patane"), inquiring into the availability of shared IP and Health Effects work, or alternatively, working exclusively for IP. (Def.'s SMF ¶ 53; Pl.'s SMF ¶ 53; Def.'s Mot. Summ. J. at Ex. 1(P-19).)  Patane told Fischer that sharing time was not going to work and that the IP department did not have the need for a full time arrangement. (Def.'s Mot. Summ. J. at Ex. 1(P-19).)

On April 6, 2012, Patricia Woodson ("Woodson"), Pepper's Director of Administration and Human Resources, emailed Fischer following a meeting the two had on April 4.  Woodson stated that "per your concerns, I have . . . reviewed your hours worked, and re-reviewed your doctor's note dated February 26, 2012."  (Def.'s SMF ¶ 70; Pl.'s SMF ¶ 70; Def.'s Mot. Summ. J. at Ex. 1(P-23).)  Noting Dr. Turk's estimation of an arrival time between 11:30 a.m. and 1:00 p.m., Woodson told Fischer that "the firm expects you to be able to arrive at work within this 90 minute window per your physician's note."  (Def.'s Mot. Summ. J. at Ex. 1(P-23).)  Woodson also told Fischer he could reduce his mandatory one hour break "by 30 minutes, which would provide you with another 2.5 hours of work each week."  (*Id*.)  Woodson then broke down different scenarios depending on when Fischer arrived at work:

> [Y]ou have the potential to work a 40 hour work week if you start at 11:30 am; a 37.5 hour work week if you start at 12 noon; a 35 hour work week if you start at 12:30 pm; or a 32.50 hour work week if you start at 1:00 pm.  We believe that these three actions—a flexible late morning start time; your option to reduce your meal period; and an extended 8:00 pm completion time—are reasonable and are in line with your medical provider's request.

(*Id*.)  Fischer told Woodson that the February 2012 note was no longer valid, but did not provide another note at that time.  (Def.'s SMF ¶ 76; Pl.'s SMF ¶ 76.)

On October 5, 2012, Fischer told Woodson that he felt Hamilton was discriminating against him based on his disability, and retaliating against him for complaining about discrimination.  (Def.'s SMF ¶ 78; Pl.'s SMF ¶ 78; Woodson Dep. 65:11–66:2.)  Fischer believed Hamilton had sabotaged his request to work in IP and also given him a "verbal beat down."  (Fischer Dep. 212:18–24.)  The "verbal beat down" occurred during a meeting between Fischer, Hamilton and Cleghorn, where Hamilton allegedly stated: (1) he was "kind of pissed" about Fischer working until 8:30 p.m. every night for twenty two months; (2) he had better things to do than worry about when Fischer was leaving work every night; and (3) he "doesn't

like to get up early either." (*Id.* 212:18–215:2.)  Fischer also told Woodson that the

accommodations he had received thus far were inadequate.  (Def.'s SMF ¶ 79; Pl.'s SMF ¶ 79;

Woodson Dep. 69:12–20.)  Pepper appointed Tracey Diamond ("Diamond"), an attorney from its

Labor and Employment Practice Group, to investigate Fischer's complaint.  (Def.'s SMF ¶ 81;

Pl.'s SMF ¶ 81.)  The investigation found no discrimination, but was never memorialized in

writing.  (Def.'s SMF ¶ 82; Pl.'s SMF ¶ 82; Woodson Dep. 72:3–8.)

   Fischer provided Pepper with an updated note from Dr. Turk on November 13, 2012.  Dr.

Turk stated that "[Fischer] is unable to arrive at the office before 12 Noon.  His actual arrival

time would likely be between 12 Noon and 2pm and would depend on his current functioning."

(Def.'s SMF ¶ 80; Pl.'s SMF ¶ 80; Def.'s Mot. Summ. J. at Ex. 1(P-4); Pl.'s Resp. at Ex. I.)  In

response, Pepper sent Fischer a memorandum dated November 21, 2012, which provided:

> Effective Monday, November 26, 2012, the firm will provide the following
> additional accommodations so that you can perform the essential functions of
> your position as a project attorney.  In compliance with your most recent doctor's
> note, although the traditional workday begins at 9 a.m., you will be permitted to
> arrive at work between 12 noon and 2 p.m.  Although the traditional workday
> ends between 5 p.m. and 7 p.m., you will be permitted to continue to work in the
> office until 8 p.m.  If you arrive later than 12 noon, you will be permitted to make
> up the hours (up to eight hours per day), by telecommuting from home.  For
> example, if you arrive at work at 2 p.m., you will work six hours in the office
> until 8 p.m. and then you may work up to two hours from home.  You are not
> required to take meal breaks, but you are permitted to do so if you choose.
> You are expected to produce work at the same rate and quality level as others in
> your position.  You are expected to arrive at work no later than 2 p.m. each day
> unless there is a supporting doctor's note or some other documented reason for
> your tardiness or absence as permitted by firm policy.  If there is no such
> documented reason which will permit the particular tardiness or absence, you will
> be subject to discipline under applicable firm policies.

(Def.'s SMF ¶ 83; Pl.'s SMF ¶ 83; Def.'s Mot. Summ. J. at Ex. 1(P-25); Pl.'s Resp. at Ex. J.)

Five days later, Fischer asked for one hour of "wiggle room" given that other project attorneys

would sometimes arrive at 9:30 a.m.  (Def.'s SMF ¶ 86; Pl.'s SMF ¶ 86; Def.'s Mot. Summ. J. at

Ex. 1(P-26).)  He also asked for an additional 0.4 hours of telecommuting to account for

bathroom breaks.  (Def.'s SMF ¶ 87; Pl.'s SMF ¶ 87; Def.'s Mot. Summ. J. at Ex. 1(P-26).)

      Woodson contacted Dr. Turk on December 17, 2012 to clarify Fischer's arrival time.

(Def.'s SMF ¶ 88; Pl.'s SMF ¶ 88.)  Woodson testified that Dr. Turk told her: (1) the latest

Fischer would arrive would be 3:00 p.m.; (2) he knew Fischer had been arriving much later in

the afternoon; (3) he had no control over what time Fischer arrived in the office; and (4) he was

just repeating what [Fischer] told him.  (Woodson Dep. 88:18–89:3.)  In contrast, Fischer

contends that Dr. Turk told Woodson the latest he would arrive was 4:00 p.m.  (Fischer Dep.

252:6–24.)

      On January 3, 2013, Hamilton emailed all project attorneys and stated that "[w]ork must

be conducted Monday through Friday between the hours of 7:00 am–7:00 pm.  This is a full-time

job and you are expected to be present and able to perform assignments during the core office

hours of 9:00 am–5:00 pm (with allowance for reasonable breaks and lunch)."  (Pl.'s Resp. at Ex.

D.)  On February 7, 2013, Fischer attended an independent medical exam at Pepper's request.

(Def.'s SMF ¶ 101; Pl.'s SMF ¶ 101.)  Dr. Sunil Sharma ("Dr. Sharma") stated that "[i]f left to

him, [Fischer's] best sleep comes in between 5 a.m. to 8 a.m. in the morning."  (Pl.'s Resp. at Ex.

L.)  Dr. Sharma recommended "that [Fischer] talk to his employer to look for a suitable job to

accommodate his sleep pattern."  (*Id*.)  On March 1, 2013, Woodson sent a memorandum to

Fischer which stated:

> Dr. Sharma indicates, "*I recommend that patient talk to his employer to look for a
> suitable job to accommodate his sleep pattern.*"  Additionally, it states, "*If left to
> him, his best sleep comes in between 5 a.m. to 8 a.m. in the morning.*"  The latter
> statement is inconsistent with several entries on your time records which reflect
> that you are working from home (not sleeping) between those hours.  With respect
> to Dr. Sharma's other comment, unfortunately at this time, the Firm does not have
> a position that would enable you to dictate your work hours and still perform the
> essential functions of your job.

(Def.'s Mot. Summ. J. at Ex. 1(P-35).)  Woodson further stated that "[g]oing forward, arrivals after 2 p.m. and/or failure to maintain full-time hours without a supporting doctor's note or other valid excuse will be considered unexcused and may subject you to further discipline, up to and including termination from employment."  (*Id*.)

On March 13, 2013, Fischer emailed Woodson disputing that a full-time schedule was an essential function of his job.  (Pl.'s Resp. at Ex. K.)  Fischer stated:

> I've already repeatedly pointed out to you that the team was repeatedly told this is a full-time job (and were allowed to bill in excess of 40 hours per week, subject to the 200 hour monthly cap) – Matt Hamilton's 01-02-2013 email that you attached is a recent example – but for the last 4 ½ or so years, by denying me a reasonable accommodation for my disability that would give me billing parity with my coworkers, I was forced to have only a part-time schedule . . . . Also, since you insist that this is a full-time job, I have clearly lost out on considerable past wages over the last 4 ½ or so years since I was denied a reasonable accommodation for my disability that would give me billing parity with my coworkers without disabilities and was forced to work part-time.

(*Id*.)  Fischer suggested that "a reasonable accommodation might include permitting me to work later and more hours at the office in my current job."  (*Id*.)  Woodson responded to Fischer's email on April 3, 2013, stating "[w]e have taken all factors regarding your request into consideration, as well as information received from Drs. Turk and Sharma."  (Def.'s Mot. Summ. J. at Ex. 1(P-38); Pl.'s Resp. at Ex. M.)  Woodson notified Fischer that the November 21, 2012 accommodation remained appropriate.  (*Id*.)  She went on to say that:

> Unfortunately, despite the reasonable accommodations that have been made for you, your time records reflect that on some days you continue to arrive at work much later than the range of hours (12:00 noon to 2:00 pm) that Dr. Turk indicated you would arrive.  Please be advised that continued tardiness is a performance problem that could result in termination of your employment.

(*Id*.)

Pepper terminated Fischer on June 3, 2013.  Fischer's termination letter noted that between May 13 and May 30 he arrived after 2:00 p.m. on seven occasions.  (Def.'s SMF ¶ 107; Pl.'s SMF ¶ 107; Def.'s Mot. Summ. J. at Ex. 1(P-39).)  The letter also provided that "on five occasions between May 13 [and] May 24 (and on many previous occasions since telecommuting was first allowed as a reasonable accommodation), you failed to take advantage of the telecommuting accommodation."  (Def.'s Mot. Summ. J. at Ex. 1(P-39).)  Woodson, Hamilton and Diamond were involved in the termination decision.  (Woodson Dep. 30:5–24.)

Fischer's time sheets between his November 26, 2012 final schedule adjustment and his June 3, 2013 termination establish that: he arrived to work after 2:00 p.m. on 50 occasions; he took breaks of more than an hour on ten occasions; and he failed to make use of the telecommuting option on more than 50 occasions.  (Def.'s SMF ¶¶ 90, 94–97; Pl.'s SMF ¶¶ 90, 94–97; Def.'s Mot. Summ. J. at Ex. 1(P-31).)  Fischer's time sheets also establish that out of the 135 days he worked during that period: he worked less than seven hours on 89 days; and he worked less than five hours on 32 days.  (*Id.*)

Fischer filed charges of discrimination and retaliation based on his disability with the Equal Employment Opportunity Commission ("EEOC") on February 4, 2015.  (Def.'s SMF ¶ 115; Pl.'s SMF ¶ 115; Def.'s Mot. Summ. J. at Ex. 7(B).)  The EEOC dismissed the charges for lack of evidence, finding: "There is no evidence of failure to accommodate [Fischer] in this matter.  Further, there is no evidence of retaliation in this matter.  According to the evidence, [Pepper] took clear measures to engage in an interactive process.  (Def.'s SMF ¶¶ 115–16; Pl.'s SMF ¶¶ 115–16; Def.'s Mot. Summ. J. at Ex. 7(C, D).)

**II.**

Fischer filed a *pro se* complaint on May 1, 2015.  (ECF No. 1.)  Fischer requested

appointment of counsel during the Court's July 13, 2015 Rule 16 conference.  (ECF No. 10.)

The Court granted Fischer's request and his appointed counsel entered his appearance on August

17, 2015.  (ECF No. 11.)  Pursuant to the Court's Scheduling Order, fact discovery ended on

November 13, 2015 and motions for summary judgment were due on November 30, 2015.  (ECF

No. 9.)

On November 18, 2015, after receiving an administrative exhaustion notice from the

Pennsylvania Human Relations Commission ("PHRC"), Fischer's counsel emailed Pepper's

counsel seeking leave to add parallel disability discrimination and retaliation claims under the

PHRA.  (ECF No. 17 at Ex. A.)  Pepper agreed under two conditions: (1) any addition would not

require additional discovery; and (2) the amended complaint would be filed before the November

30 dispositive motion deadline.  (*Id*. at Ex. B.)  Fischer filed his amended complaint on

November 27, 2015.  (ECF No. 15.)  In addition to the parallel PHRA claims, Fischer added

claims for failure to engage in the interactive process under the ADA and the PHRA.  (*Id*.)

Pepper filed a motion to strike Fischer's interactive process claims.  (ECF No. 17.)  Fischer did

not respond to Pepper's motion.  (*See generally* ECF Nos. 1–38.)  On January 14, 2016, the

Court held a telephone conference with all counsel, during which both parties stipulated that

Pepper would allow the new claims if Fischer agreed that no additional facts or discovery would

be needed to support those claims.  (ECF No. 31.)

Before the Court is Pepper's motion for summary judgment.  (ECF No. 16.)  Fischer filed

a response on December 13, 2015.  (ECF No. 18.)  Pepper filed its reply on December 21, 2015

(ECF No. 19) and Fischer filed his sur-reply on December 27, 2015.  (ECF No. 22.)  Both parties

14

also submitted supplemental briefing on Fischer's interactive process claims.  (ECF Nos. 28, 30.)
The Court held oral argument on Pepper's motion on January 21, 2016 and has thoroughly
reviewed the entire record.  (ECF No. 38.)

## III.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute
as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A dispute is genuine if the
evidence is such that a reasonable factfinder could return a verdict for the nonmoving party.  *See
Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).  Summary judgment is granted where
there is insufficient record evidence for a reasonable factfinder to find for the plaintiff.  *Id.* at
252.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be
insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."
*Id.*

When ruling on a motion for summary judgment, the Court may only rely on admissible
evidence.  *See, e.g., Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 95 (3d Cir. 1999).  A
Court must view the facts and draw all reasonable inferences in favor of the nonmoving party.
*See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004).  However, "an inference
based upon a speculation or conjecture does not create a material factual dispute sufficient to
defeat entry of summary judgment."  *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d
Cir. 1990).

## IV.

The ADA makes it unlawful for an employer "to discriminate against a qualified
individual on the basis of disability in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[3]  42 U.S.C. § 12112(a).  Fischer alleges two types of discrimination claims under the ADA: (1) failure to accommodate; and (2) disparate treatment. "[F]ailure to accommodate and disparate treatment are analytically distinct claims.  In order to establish a violation of the ADA, a claim brought under failure to accommodate does not require any evidence or inference of intentional discrimination.  Thus, these allegations are not evaluated using the *McDonnell Douglas* framework."  *Walton v. Mental Health Assn. of Se. Pennsylvania*, 96-5682, 1997 WL 717053, at *10 (E.D. Pa. Nov. 17, 1997) *aff'd sub nom. Walton v. Mental Health Ass'n. of Se. Pennsylvania*, 168 F.3d 661 (3d Cir. 1999).

Fischer's "failure to accommodate" claims allege that Pepper failed to provide him with a reasonable accommodation for his disability and/or failed to engage in the interactive process. (Am. Compl. ¶¶ 99(a)–(i), 100–123.)  Fischer's "disparate treatment" claims allege that Pepper intentionally discriminated against him by: (1) terminating him because of his disability; (2) permitting individuals to make denigrating remarks about his disability; (3) setting job requirements that his disability would not permit him to meet; and (4) imposing restrictions on his weekend work times.[4]  (*Id.*)

---

[3]      "The PHRA is basically the same as the ADA in relevant respects and 'Pennsylvania courts . . . generally interpret the PHRA in accord with its federal counterparts.'"  *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)).  The Court's analysis of Fischer's ADA claims therefore applies equally to his PHRA claims.

[4]      Fischer's briefing was of limited guidance to the Court, with few citations to the record, disorganized structure, poor formatting and incorrect statements of the law.  Fischer's response brief not only misstates the Third Circuit's Model Jury Instructions, but also asks the Court to apply a "mixed-motive" standard to his "pretext" argument.  (*See generally* Pl.'s Resp.)  His "failure to accommodate" claim is made in two distinct sections of the brief, with bits of "disparate treatment" argument scattered throughout.  (*Id.*)  The Amended Complaint is even less helpful.  Fischer's discrimination and retaliation claims are asserted under the same count, leaving to the Court the task of discerning which of the nine adverse actions apply to each claim.  (*See generally* Am. Compl.)

A.      *Failure to Provide Reasonable Accommodation*

Fischer alleges that Pepper failed to provide a reasonable accommodation for his disability.  In order to establish a *prima facie* case of failure to accommodate under the ADA, Fischer must establish: (1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation; and (3) Pepper refused to provide him with a proposed reasonable accommodation.  *See Solomon v. Sch. Dist. of Philadelphia*, 882 F. Supp. 2d 766, 779 (E.D. Pa. 2012).  Pepper does not contest that Fischer is disabled within the meaning of the ADA.  (*See generally* Def.'s Mot. Summ. J.) Pepper does contend however that Fischer is not a qualified individual.  (*See id*. at 15–16.)

Under the ADA, a "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position."  42 U.S.C. § 12111(8).  "To satisfy this requirement, a plaintiff must first demonstrate that [he] 'satisfies the requisite skill, experience, education and other job-related requirements of the employment position that such individual holds or desires.'"  *Skerski v. Time Warner Cable Co., a Div. of Time Warner Entm't Co., L.P.*, 257 F.3d 273, 278 (3d Cir. 2001) (citing *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 148 (3d Cir. 1998)).  "Second, a plaintiff must establish that [he], 'with or without reasonable accommodation, can perform the essential functions of the position held or sought.'"  *Id*.  Pepper does not contest that Fischer had the requisite skill, experience and education to work as a project attorney.  (*See* Def.'s Mot. Summ. J. at 15–16.)  The issue is whether Fischer could perform the essential functions of his job with or without reasonable accommodation.  The Court must therefore begin by determining what constitutes an essential function.

The EEOC's regulations provide that a job's "essential functions" are those that are "fundamental," not "marginal."  29 C.F.R. § 1630.2(n)(1).  The regulations also provide a non-exhaustive list of evidence courts may consider when determining what constitutes an essential function of an employee's job.  Such evidence includes, *inter alia*, the employer's judgment as to which functions are essential and the employee's actual experience working in the position.  *See Skerski*, 257 F.3d at 281 (referencing 29 C.F.R. § 1630.2(n)(3)(i), (iv), (vi) and (vii)).

Pepper contends that one essential function of Fischer's position as a project attorney was attending work in a regular and predictable manner.  (Def.'s Mot. Summ. J. at 15–18; Oral Arg. 10:18–25.)  The Third Circuit Court of Appeals has indirectly held that regular and predictable attendance can constitute an essential function of an employee's job.  *See, e.g.*, *Miller v. Univ. of Pittsburgh Med. Ctr.*, 350 F. App'x 727, 729 (3d Cir. 2009) ("Although we have not directly ruled on the issue, we have summarily affirmed two district court cases that have held accordingly.") (citing *Santiago v. Temple Univ.*, 739 F. Supp. 974, 979 (E.D. Pa. 1990) *aff'd*, 928 F.2d 396 (3d Cir. 1991); *Johnson v. Children's Hosp. of Phila.*, 94-5698, 1995 WL 338497, at *2 (E.D. Pa. June 5, 1995), *aff'd*, 79 F.3d 1138 (3d Cir. 1996)).

Attendance cases are unique given that "the applicable [EEOC] factors do not shed much light on whether a regular and predictable schedule is an essential function of a [job]. Attendance is not specific to any factor but presumably applies to and affects each of them." *Ward v. Massachusetts Health Research Inst., Inc.*, 209 F.3d 29, 34–35 (1st Cir. 2000).  It may seem evident at first that regular on-site attendance is "the basic, most fundamental" . . . "activity" of an employee's job.  *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 762 (6th Cir. 2015) (en banc) (citing Webster's Third New International Dictionary 777, 920 (1986) (defining "essential" and "function")).  A closer examination of the case law from other circuits however

reveals that the inquiry into whether regular attendance constitutes an essential function of a job depends in large part on the *nature* of the job itself.

The Sixth Circuit Court of Appeals issued the most recent opinion on this topic in its en banc decision in *E.E.O.C. v. Ford Motor Co.* The plaintiff in that case was a resale buyer of steel whose irritable bowel syndrome made her presence at work unpredictable. *Ford Motor Co.*, 782 F.3d at 758–59. The plaintiff requested to telecommute from home up to four days a week. *Id*. at 759. Describing the nature of the plaintiff's position, the court observed that a "resale buyer's job is highly interactive" and "require[s] good, old-fashioned interpersonal skills." *Id*. at 758. The plaintiff's position required her to "meet with suppliers at their sites and with Ford employees and stampers at Ford's site—meetings that Ford [said] [were] most effectively performed face to face." *Id*.

The court analyzed that "in most jobs, *especially those involving teamwork and a high level of interaction*, the employer will require regular and predictable on-site attendance from all employees." *Id*. at 762 (emphasis added). The court further provided:

> The EEOC's informal guidance on the matter cuts in the same direction. An employer may refuse a telecommuting request when, among other things, the job requires "face-to-face interaction and coordination of work with other employees," "in-person interaction with outside colleagues, clients, or customers," and "immediate access to documents or other information located only in the workplace."

*Id*. (citing EEOC Fact Sheet, *Work At Home/Telework as a Reasonable Accommodation*, http://www.eeoc.gov/facts/telework.html (Oct. 27, 2005)). Ultimately, the court held that regular and predictable on-site attendance was required for the plaintiff's position as a resale buyer:

> The required teamwork, meetings with suppliers and stampers, and on-site availability to participate in face-to-face interactions, all necessitate a resale buyer's regular and predictable attendance. For years Ford has required resale buyers to work in the same building as stampers, further evidencing its judgment that on-site attendance is essential. And the practice has been consistent with the

> policy: all other resale buyers regularly and predictably attend work on site. Indeed, even those who telecommute do so only one set day per week and agree in advance to come into work if needed.  Sealing the deal are [the plaintiff's] experiences and admissions.  Her excessive absences caused her to make mistakes and caused strife in those around her.  And she agreed that four of her ten primary duties could not be performed from home.  On this record, the EEOC cannot show that regularly attending work was merely incidental to Harris's job; it was essential to her job.

*Id*. at 763 (internal citations and formatting omitted).  The court's holding was therefore premised on the high level of interactivity inherent in a resale buyer's job duties, along with the plaintiff's inability to effectively complete her duties from home.

Decisions from other circuits have focused on similar criteria when determining whether regular attendance constitutes an essential function of an employee's job.  *See Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (finding attendance essential for a neo-natal nurse).  Some courts emphasize the teamwork aspect of a job.  *See, e.g.*, *Hypes v. First Commerce Corp.*, 134 F.3d 721, 727 (5th Cir. 1998) (finding attendance essential for a loan review analyst working on a commercial portfolio team).  Other courts focus on whether the job requires face-to-face interaction with clients and other employees.  *See, e.g.*, *Nowak v. St. Rita High Sch.*, 142 F.3d 999 (7th Cir. 1998) (teacher); *Nesser v. Trans World Airlines, Inc.*, 160 F.3d 442 (8th Cir. 1998) (airline customer service agent); *Tyndall v. Nat'l Educ. Ctrs.*, 31 F.3d 209 (4th Cir. 1994) (teacher).  Other courts look to whether the employee has to work with items and equipment available only on site.  *See, e.g.*, *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943 (7th Cir. 2001) (en banc) (dockworker); *Jovanovic v. In–Sink–Erator*, 201 F.3d 894 (7th Cir. 2000) (tool and die maker); *Corder v. Lucent Techs., Inc.*, 162 F.3d 924 (7th Cir. 1998) (telephone customer support); *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191 (4th Cir. 1997) (computer consultant); *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755 (5th Cir.

1996) (mechanic); *Jackson v. Veterans Admin.*, 22 F.3d 277 (11th Cir. 1994) (housekeeping aide).

Cases in this Circuit similarly involve jobs that require regular and predictable on-site attendance. *See, e.g.*, *Miller*, 350 F. App'x at 729 ("Given the *nature* of Miller's job, *assisting during surgery* performed in the hospital, we find it evident that attendance is an essential element of this position.") (emphasis added); *Santiago*, 739 F. Supp. at 976 (operating room attendant); *Johnson*, 1995 WL 338497, at *1 (aide in hospital's radiology department).

Pepper contends that the nature of Fischer's job mirrors that of the plaintiff in *Ford Motor Co.*, and accordingly that regular and predictable on-site attendance is essential.  (Def.'s Mot. Summ. J. at 16–17.)  The record is unclear on that point.  For example, project attorneys rarely interact with clients.  (Hamilton Dep. 45:9–12.)  At times however, project attorneys do work in teams.  (Fischer Dep. 108:1–12.)  Whether Fischer's job requires a high level of interactivity is uncertain.

The projects to which Fischer was assigned included reviewing documents, contracts and settlement agreements.  (*Id.* 64:11–16; 65:24–66:1.)  However, many of those documents could be accessed online.  (*Id.*; Hamilton Dep. 40:20–24 (stating document review "more and more these days" is conducted on an electronic system).)  While Pepper's policy provided that project attorneys should work within the hours of 7:00 a.m. to 7:00 p.m. with core hours of 9:00 a.m. to 5:00 p.m., the record also establishes that Pepper allowed a number of project attorneys to telecommute.  (Def.'s Mot. Summ. J. at Ex. 7(A); Pl.'s Resp. at Ex. C, P ¶ 18.)  In the absence of definitive guidance from the Third Circuit Court of Appeals, combined with ambiguity in the record, the Court cannot conclude as a matter of law that regular and predictable on-site attendance was an essential function of Fischer's job.  The nature of his position is one which a

reasonable factfinder could determine does not necessitate regular and predictable on-site attendance.

Pepper also contends that working a full-time schedule was an essential function of Fischer's job.  (Def.'s Mot. Summ. J. at 16–17; Oral Arg. 10:18–25.)  In determining how many project attorneys to staff on a particular project, Pepper used a "pages per lawyer working *full-time per day* calculation."  (Hamilton Dep. 42:15–18.) (emphasis added).  Additionally, Hamilton's 2008 email to all project attorneys established core hours of 9:00 a.m. to 5:00 p.m. (Def.'s Mot. Summ. J. at Ex. 7(A); Pl.'s Resp. at Ex. C.)  At the very least, Pepper contends it wanted to see Fischer working 32.5 hours a week.  (Woodson Dep. 52:13–23; Def.'s Mot. Summ. J. at Ex. 1(P-23).)

"The EEOC's Interpretive Guidance indicates that 'the employer's judgment as to which functions are essential' . . . [can constitute] evidence for determining the essential functions of a position, but that such evidence is not to be given greater weight simply because it is included in the non-exclusive list set out in 29 C.F.R. § 630.2(n)(3)."  *Deane*, 142 F.3d at 148 (citing 29 C.F.R. Pt. 1630, App. § 1630.2(n)).  The Court must also consider Fischer's *actual* experience working in his position.  *Skerski*, 257 F.3d at 281.  In the context of working a full-time schedule, such evidence necessarily includes the number of hours Fischer worked.  Fischer's time sheets establish that from December 28, 2009 to October 21, 2011, he worked an average of 29.1 hours per week.  (Pl.'s Resp. at Ex. A.)  This average time worked over the course of nearly two years, without any record evidence of discipline, raises a factual dispute about whether working full-time was an essential function of Fischer's job.[5]

---

[5]     Fischer also referenced a document at oral argument that was handwritten by Woodson, and produced pursuant to a late discovery request.  (Oral Arg. 85:1–86:4.)  The document is undated, but states that Fischer "is/has been working p/t since approx. July 2008."  (Woodson Note, Bates No. D00681.)

Fischer's emails raise additional discrepancies.  For example, Fischer's first email to Hamilton requesting IP work states that "[s]pending about 5 hours a day on Health Effects and the balance of my time on IP should make *a full time schedule*."  (Def.'s Mot. Summ. J. at Ex. 1(P-17).) (emphasis added).  Indeed, all of Fischer's email requests seem to be directed toward achieving a full-time schedule—a position at odds with someone who now claims that they were always a part-time employee.  However, such factual inconsistencies in the record prevent the Court from determining as a matter of law that working full-time was an essential function of Fischer's job.

Because genuine issues of material fact exist as to whether regular and predictable on-site attendance or working full-time are essential functions, and therefore whether Fischer is a "qualified individual" under the ADA, his failure to accommodate claim must be resolved by the jury.  *Skerski*, 257 F.3d at 283 (holding that where material issues of fact exist as to an employee's essential functions, case must be sent to trial); *see also Oden v. SEPTA*, 14-6197, 2015 WL 5838481, at *6 (E.D. Pa. Oct. 5, 2015) (refusing to define essential functions given "our Court of Appeals' disdain for district courts defining an essential function as a matter of law and usurping the role of the jury").

## B.      *Failure to Engage in the Interactive Process*

Fischer also claims that Pepper discriminated against him by failing to engage in the interactive process.  (Pl.'s Supp. Br. at 3–5.)  The ADA's regulations provide: "To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of accommodation.  This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations."  29 C.F.R. § 1630.2(o)(3).

To establish that Pepper failed to engage in the interactive process, Fischer must demonstrate: (1) Pepper knew about his disability; (2) he requested accommodations or assistance for his disability; (3) Pepper did not make a good faith effort to assist him in seeking accommodations; and (4) he could have been reasonably accommodated but for Pepper's lack of good faith.  *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 319–20 (3d Cir. 1999). Participation in the process "is the obligation of both parties, however, so an employer cannot be faulted if after conferring with the employee to find possible accommodations, the employee then fails to supply information that the employer needs or does not answer the employer's request for more detailed proposals." *Id.* at 317.

Pepper does not contest that it knew of Fischer's disability or that Fischer requested accommodations for his disability.  (Def.'s Supp. Br. at 2–5.)  Rather, Pepper contends that it made a good faith effort in determining available accommodations for Fischer.  (*Id.*)  The Third Circuit in *Taylor* stated:

> Employers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome.   These steps are consistent with the recommendations in the EEOC's interpretive guideline.

*Id.* (citing 29 C.F.R. Pt. 1630, App. § 1630.9).  The record clearly establishes that Pepper engaged in the interactive process.  When Fischer presented Dr. Wagman's note in March 2009, Pepper adjusted Fischer's schedule despite the note being vague as to how his "sleepiness time" was being delayed.  (Def.'s Mot. Summ. J. at Ex. 1(P-12).)  After Fischer requested to work later in December 2009, Hamilton again adjusted Fischer's schedule.  (Def.'s Mot. Summ. J. at Ex. 1(P-15); Pl.'s Resp. at Ex. E.)  When presented with Dr. Turk's note in February 2012, Pepper

adjusted Fischer's schedule to the time period recommended in the note.  (Def.'s Mot. Summ. J. at Ex. 1(P-18).)  And if three adjustments were somehow not enough to demonstrate good faith, Pepper adjusted Fischer's schedule for a fourth time upon receipt of Dr. Turk's November 2012 note.  (Def.'s Mot. Summ. J. at Ex. 1(P-25); Pl.'s Resp. at Ex. J.)  Pepper, throughout the entire time, was consistent in considering Fischer's requests and doctor's notes, working with him to determine what accommodations were available, and adjusting his schedule accordingly.

If the record indicates a lack of good faith, it was on Fischer's part.  Overton asked Fischer for a doctor's note in August 2008 after Fischer was routinely showing up late.  (Def.'s Mot. Summ. J. at Ex. 1(P-7).)  After nearly four months passed without any note being provided, Hamilton again requested a doctor's note in January 2009.  (Def.'s Mot. Summ. J. at Ex. 1(P-9).)  Fischer waited another two months before finally procuring Dr. Wagman's note, which was noticeably lacking any "specific details as to limitations and [] terms of duration" as Hamilton requested.  (Def.'s Mot. Summ. J. at Ex. 1(P-7, P-12).)  "[A]n employer cannot be faulted if . . . the employee . . . fails to supply information that the employer needs." *Taylor*, 184 F.3d at 317. In any event, the record clearly demonstrates that Pepper acted in good faith by trying to work with Fischer and accommodate his disability.  Fischer's failure to engage in the interactive process claim is accordingly dismissed.

C.      *Intentional Disability Discrimination*

Fischer's remaining discrimination claims allege that Pepper intentionally discriminated against him on the basis of his disability by: (1) terminating him because of his disability; (2) permitting individuals to make denigrating remarks about his disability; (3) setting job requirements that his disability would not permit him to meet; and (4) imposing restrictions on his weekend work times.  (Am. Compl. ¶¶ 99(a)–(i), 100–23.)

Discrimination claims based on allegations of indirect discrimination are analyzed under the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 (3d Cir. 2002) (differentiating discrimination claims based on "direct" and "indirect" evidence).  Under this framework, Fischer must first establish a *prima facie* case of discrimination under the ADA.  *See Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 761 (3d Cir. 2004).  Fischer's burden at this stage of the analysis is "not meant to be onerous."  *Cellucci v. RBS Citizens, N.A.*, 987 F. Supp. 2d 578, 589 (E.D. Pa. 2013).  If Fischer succeeds in establishing a *prima facie* case, the burden shifts to Pepper "to articulate some legitimate, nondiscriminatory reason for the [adverse action]."  *McDonnell Douglas*, 411 U.S. at 802.  "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff."  *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).  If the defendant meets its "relatively light burden" of articulating a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to "show . . . that the employer's explanation is pretextual."  *Id.*

 "To establish a *prima facie* case of discrimination under the ADA, a plaintiff must . . . show '(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.'"  *Williams*, 380 F.3d at 761 (citing *Taylor*, 184 F.3d at 306).  Pepper does not contest that Fischer was disabled under the ADA.  The Court will also assume, for purposes of this claim only, that Fischer is otherwise qualified to perform the essential functions of his job.  *See supra* Part IV(A)(i) (finding factual disputes regarding Fischer's "qualified" status).  The

issue then becomes whether Fischer suffered from an adverse employment decision as a result of discrimination.  If so, Pepper may proffer a legitimate non-discriminatory reason for its action and shift the burden back to Fischer to establish pretext.  As stated above, Fischer alleges four separate adverse actions.

i.    *Termination*

Fischer first alleges that his termination constitutes an adverse employment decision resulting from discrimination.  (Am. Compl. ¶¶ 99(a)–(i), 100–23.)  An adverse employment action "is one which alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee."  *Decker v. Alliant Techs., LLC*, 871 F. Supp. 2d 413, 428 (E.D. Pa. 2012) (citing *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir.1997) *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 60 (2006)).  Fischer's termination was obviously an adverse action.

Fischer must also however "provide evidence that supports a logical inference of causation between the alleged disability and the adverse employment action."  *Mengel v. Reading Eagle Co.*, 11-6151, 2013 WL 1285477, at *4 (E.D. Pa. Mar. 29, 2013) (citing *Yeskey v. Pa. Dept. of Corrections*, 118 F.3d 168 (3d Cir. 1997) *aff'd*, 524 U.S. 206 (1998)).  Fischer alleges that Cleghorn "basically laughed at me for having a disability" in October 2011.  (Pl.'s Resp. at Ex. F.)  Fischer also filed a complaint in October 2012 after Hamilton stated: "[I don't] like to get up early either."  (Fischer Dep. 212:18–215:2.)  Both Hamilton and Cleghorn deny that any discriminatory statements were made.  (Cleghorn Dep. 59:16–60:11; Hamilton Dep. 141:3–142:17.)  Additionally, Pepper's investigation into Fischer's complaints found no discrimination.  (Woodson Dep. 72:3–8.)  Taking the facts in the light most favorable to Fischer

27

however, and given that his burden at this stage is "not meant to be onerous," the Court finds that he has sufficiently established a *prima facie* case of disability discrimination based on his termination. *Cellucci*, 987 F. Supp. at 589.

The burden shifts back to Pepper to articulate a legitimate non-discriminatory reason for its decision. Pepper's articulated reason for terminating Fischer was his continued failure to arrive at work during the accommodated time and to work a full-time schedule. (Def.'s Mot. Summ. J. at Ex. 1(P-39).) The record establishes that Fischer consistently failed to comply with his schedule adjustments and work a full time schedule. *See supra* Part I. Pepper has clearly met its "relatively light" burden. *Fuentes*, 32 F.3d at 763.

Because Pepper has established a legitimate non-discriminatory reason, the burden shifts back to Fischer to establish pretext. To meet this burden at summary judgment, Fischer must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. Fischer "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Pepper's] proffered legitimate reason[] for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.* at 765 (quotation omitted). Fischer cannot merely assert that Pepper's proffered reason was wrong; he must show that "it was so plainly wrong that it cannot have been [Pepper's] real reason." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997).

"[S]tatements of a person involved in the decisionmaking process that reflect a discriminatory . . . animus" may be used to establish pretext. *Fakete*, 308 F.3d at 339. In determining "whether a statement can constitute overt evidence sufficient to show . . . a

discriminatory animus . . . the Third Circuit considers whether the speaker was a decisionmaker, the content of the statement and whether the statement was related to the decisional process." *Kargbo v. Philadelphia Corp. for Aging*, 16 F. Supp. 3d 512, 523–24 (E.D. Pa. 2014) (citing *Armbruster v. Unisys Corp.*, 32 F.3d 768, 779 (3d Cir. 1994)) (internal citations omitted).

Fischer cannot establish that Pepper's reason for terminating him was pretextual. Pepper consistently documented its disappointment with Fischer's attendance between 2007 and 2013. *See supra* Part I. When Pepper adjusted Fischer's schedule pursuant to his requests and/or doctor's notes, Fischer continually failed to work within the adjusted parameters. *Id.* After Fischer's final adjustment in November 2012, Pepper warned him on two separate occasions that he was not abiding by the modified schedule and was failing to make use of the telecommuting option. *Id.* Fischer cannot point to any evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Pepper's] proffered legitimate reason . . . that a reasonable factfinder could rationally find . . . unworthy of credence." *Fuentes*, 32 F.3d at 765 (quotation omitted). Pepper was consistent in expressing its dissatisfaction with Fischer's lack of compliance with the adjusted schedules.

Moreover, the comments allegedly made by Hamilton and Cleghorn are at most stray remarks which do not establish pretext. Cleghorn was not involved in the decision to terminate Fischer. *See supra* Part I. While Hamilton was involved in the decision, "[s]tray remarks by non-decisionmakers *or by decisionmakers* unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) (emphasis added). Cleghorn's alleged remarks were made in October 2011, nearly two years before Fischer's termination. (Pl.'s Resp. at Ex. F.) Hamilton's alleged remarks occurred eight months before

Fischer's termination.  (Fischer Dep. 212:18–215:2.)  Assuming the statements were made, they

were temporally remote and clearly unrelated to the decisional process.  *See, e.g.*, *Ade v.*

*KidsPeace Corp.*, 698 F. Supp. 2d 501, 514 (E.D. Pa. 2010) *aff'd*, 401 F. App'x 697 (3d Cir.

2010) (finding two statements, one made two years and the other six months before termination,

insufficient to establish pretext).  Fischer cannot show that Pepper's articulated reason for his

termination was pretextual, and therefore fails to establish a claim of discrimination based on his

termination.[6]

### ii.    *Denigrating Remarks*

Fischer also contends that Pepper permitted individuals to make denigrating remarks

about his disability.  (Am. Compl. ¶¶ 99(a)–(i), 100–23.)  "Unnecessary derogatory comments do

not rise to the level of adverse employment actions."  *Rosati v. Colello*, 94 F. Supp. 3d 704, 714

(E.D. Pa. 2015) (citing *Middleton v. Deblasis*, 844 F. Supp. 2d 556, 566 (E.D. Pa. 2011)).  The

action must be "serious and tangible enough to alter an employee's compensation, terms,

conditions, or privileges of employment."  *Id.* (citing *Cardenas v. Massey*, 269 F.3d 251, 263 (3d

Cir. 2001)).  Permitting individuals to make two isolated comments over five years is not an

actionable adverse action under the ADA.

### iii.    *Limited Weekend Work*

Fischer contends that Pepper limited his weekend work.  (Am. Compl. ¶¶ 99(a)–(i), 100–

23.)  The only record evidence of Pepper limiting weekend work was when Woodson emailed

Fischer in 2013 telling him that his accommodated schedule applied to any approved weekend

---

[6]    Attached to Fischer's response brief are three unsworn statements that purport to establish pretext through comparator evidence.  (Pl.'s Resp. at Exs. O, Q, R.)  The Court need not consider these statements as "unsworn factual statements do not constitute competent evidence for purposes of defeating a motion for summary judgment."  *Yan Yan v. Penn State Univ.*, 529 F. App'x 167, 170 (3d Cir. 2013) (citing *Fowle v. C & C Cola, a Div. of ITT–Cont'l Baking Co.*, 868 F.2d 59, 67 (3d Cir. 1989)).

work.  (Woodson Dep. 102:1–104:2.)  The record establishes that working on the weekend required special permission.  (Fischer Dep. 151:4–17, 254:14–20.)  When Woodson sent the email, she did not know Fischer had been granted permission to work weekends.  (Woodson Dep. 102:1–104:2.)  She only became aware of the issue after reviewing Fischer's time sheets and seeing that he had worked until 12:21 a.m. and 1:26 a.m. over two weekends.  (*Id.* 102:1–104:2.)  This email at most establishes that Woodson mistakenly sent an email, unaware that Fischer had been granted permission to work weekends.  Moreover, the record is silent as to whether Fischer's weekend work was *actually* limited beyond the date of Woodson's email.  Fischer's contention that Pepper limited his weekend work—on at most one occasion—does not rise to the level of a "serious and tangible" action that altered his employment.  *Rosati*, 94 F. Supp. 3d at 714 (citing *Cardenas*, 269 F.3d at 263).

iv.     *Setting Job Requirements*

Fischer finally contends that Pepper set job requirements that his disability would not permit him to meet.  (Am. Compl. ¶¶ 99(a)–(i), 100–23.)  Assuming that imposing new job requirements could constitute an adverse action, Fischer cannot "provide evidence that supports a logical inference of causation" between his disability and the imposition of these requirements. *Mengel*, 2013 WL 1285477, at *4 (citing *Yeskey*, 118 F.3d at 168).  The requirements in question are Pepper's attendance policy and the expectation that project attorneys work a full-time schedule.

Fischer was told of Pepper's "long-standing and non-negotiable" attendance policy as early as 2007—before Pepper knew anything about his disability.  (Def.'s Mot. Summ. J. at Ex. 1(P-6).)  This attendance policy applied to all project attorneys.  (*Id.*)  It was implemented after a contract attorney billed for time he was not present or working—a situation completely unrelated

to Fischer's disability.  *See supra* Part I.  Additionally, Fischer knew that Pepper expected *all* project attorneys to work full-time.  (Pl.'s Resp. at Ex. K ("I've already repeatedly pointed out to you that the team was repeatedly told this is a full-time job.").)  Whether the imposition of these requirements was motivated by discriminatory animus is an entirely different question from whether the requirements constitute essential functions of Fischer's job.  *See supra* Part IV(A)(i).  Fischer does not and cannot point to anything in the record establishing a causal link between his disability and Pepper establishing the above job requirements.  Fischer's intentional discrimination claims are accordingly dismissed.

## V.

Fischer also alleges that Pepper retaliated against him in violation of the ADA and the PHRA.[7]  Specifically, Fischer alleges that Pepper retaliated against him by: (1) refusing to allow him to work within the IP practice group; (2) failing to give him a salary increase; (3) terminating him; and (4) arbitrarily imposing essential functions of his job.  (Am. Compl. ¶¶ 99(a)–(i), 100–23.)

To establish a *prima facie* case of retaliation, Fischer must show: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action.  *See Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995).  If Fischer establishes his *prima facie* case, "'the burden shifts to the employer to advance a legitimate, non-retaliatory reason' for its conduct and, if it does so, 'the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'"  *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir.

---

[7]     Fischer's retaliation claims under the ADA and the PHRA are analyzed the same way.  *See Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002).

2006), *as amended* (Sept. 13, 2006) (citing *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997)).

Fischer contends that he engaged in protected activity by: (1) voicing complaints of discrimination against Cleghorn and Hamilton and (2) repeatedly requesting accommodations. (Pl.'s Resp. at 12.)  Pepper does not contest that Fischer's requests or complaints constitute protected activity.  The inquiry accordingly shifts to whether Fischer suffered adverse actions.

A.   *Adverse Actions*

Fischer contends that he suffered adverse actions when: (1) Pepper refused his request to work within the IP practice group; and (2) failed to give him a salary increase.  (Pl.'s Resp. at 11–13.)  To constitute an adverse action under the ADA's anti-retaliation provisions, an action must be "materially adverse" such that it might "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 54.  The action must result in more "than a 'trivial' or minor change in the employee's working conditions." *Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 788 (3d Cir. 1998) (citing *Hampton v. Borough of Tinton Falls Police Dep't*, 98 F.3d 107, 116 (3d Cir. 1996)).

Pepper's alleged failure to raise Fischer's salary does not constitute a "materially adverse" action.  Fischer conducted no discovery on this issue.  The only record evidence establishes that beginning in 2009, Pepper limited the number of salary increases it awarded to project attorneys.  (Def.'s Mot. Summ. J. at Ex. 6 ¶ 5.)  Half of Pepper's project attorneys, a number of whom were not disabled, did not receive salary increases in 2009.  (*Id.* at ¶¶ 6–7.)

Additionally, Pepper's denial of IP work does not constitute a "materially adverse" action.  The record clearly establishes that Hamilton told Fischer:

> With respect to your request to work for the IP department, given recent
> increasing demands on the team, including several parallel priority projects that

> have drawn resources from existing projects, I can no longer make a sufficiently compelling case for you to divide your efforts on non-Health Effects work at this time.  You are free, of course, to resign your position in order to work for the IP department exclusively, but that is your call.

(Def.'s Mot. Summ. J. at Ex. 1(P-18).)  Fischer then contacted the IP department and was told that sharing time wasn't possible and that the department did not have the need for a full time arrangement.  (Def.'s Mot. Summ. J. at Ex. 1(P-19).)  Being refused a job that doesn't exist is not a "materially adverse" action that might "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 54.

Fischer also claims he suffered adverse actions when Pepper: (1) terminated him and (2) arbitrarily imposed essential functions of his job.  Pepper does not contest that these actions, if proven, could constitute adverse actions.  (Def.'s Mot. Summ. J. at 22–25.)  However, Fischer must still establish causation.  To do so, Fischer may rely on a "broad array of evidence to demonstrate a causal link between his protected activity and the adverse action taken against him." *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007), *as amended* (Aug. 28, 2007).  "In certain narrow circumstances, an 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection." *Id.* (referencing *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (finding discharge of plaintiff two days after filing EEOC complaint to be sufficient, under the circumstances, to establish causation)).[8]

---

[8]   Fischer's only causation argument is based on temporal proximity.  (Pl.'s Resp. 11–13.)  Courts may also look to the intervening period between complaints to determine whether or not there is a pattern of antagonism that could establish causation.  *Marra*, 497 F.3d at 302.  Fischer has not and cannot point to any record evidence establishing a pattern of antagonistic behavior by Pepper.  *See, e.g.*, *Robinson v. Se. Pennsylvania Transp. Auth., Red Arrow Div.*, 982 F.2d 892, 895 (3d Cir. 1993) (finding pattern of antagonism where the "constant barrage of written and verbal warnings" and disciplinary action all occurred soon after plaintiff's initial complaints and continued until his discharge).  At best, Fischer can point to the remarks allegedly made by Hamilton and Cleghorn.  However, these remarks were made a year apart and Fischer's schedule was adjusted after each.  *See supra* Part I.

B.    *Causal Link*

To survive summary judgment, Fischer must establish causation between either: (1) his complaints and his termination; (2) his complaints and the imposition of essential functions; (3) his requests for accommodation and his termination; or (4) his requests for accommodation and the imposition of essential functions.

Fischer fails to show temporal proximity between his complaints and his termination. Fischer's complaints were made in October 2011 and October 2012. (Woodson Dep. 65:11–66:2; Pl.'s Resp. at Ex. F.)  Fischer's termination occurred in June 2013. (Def.'s Mot. Summ. J. at Ex. 1(P-39).)  At best, Fischer has established an eight month gap between his complaint and his termination.  This is not the type of "unusually suggestive" proximity that establishes causation. *See, e.g.*, *Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007) (finding five-month time period between complaint and adverse action insufficient to raise an inference of causation).

Fischer also fails to establish temporal proximity between his complaints of discrimination and the imposition of essential job functions.  The functions in question are Fischer's attendance at work and the expectation that he work a full-time schedule. *See supra* Part IV(A)(i).  Fischer was told of Pepper's "long-standing and non-negotiable" attendance policy as early as 2007. (Def.'s Mot. Summ. J. at Ex. 1(P-6).)  The idea that Pepper somehow imposed this timeframe in retaliation for Fischer's complaints is unsupported by the record.

Fischer also knew that Pepper expected him to work some semblance of a full-time schedule.  At the very latest, Woodson's April 2012 email made it clear that Pepper wanted him to work at least 32.5 hours. (Def.'s Mot. Summ. J. at Ex. 1(P-23).)  Woodson went so far as to break down the different scenarios which would allow Fischer to work 32.5, 35, 37.5 and 40 hours a week. (*Id.*)  The only complaint that preceded Woodson's email was in October 2011—

6 months prior.  Fischer therefore fails to establish any "unusually suggestive" temporal proximity between his complaint and the imposition of essential functions.  *See, e.g.*, *Andreoli*, 482 F.3d at 650.

Fischer similarly fails to establish temporal proximity between his requests for accommodation and his termination.  Every time Fischer requested an accommodation, his schedule was modified.  *See supra* Part I.  His final accommodation request was in November 2012, seven months before his termination.  *Id*.  As already discussed, this gap in time is insufficient to establish causation.

Finally, Fischer fails to establish temporal proximity between his numerous requests for accommodation and the imposition of new essential functions.  As discussed above, Fischer knew about Pepper's attendance requirements as early as 2007, before he had ever requested an accommodation.  (Def.'s Mot. Summ. J. at Ex. 1(P-6).)  He also knew as early as April 2012 that Pepper expected him to meet a certain baseline of hours.  (Def.'s Mot. Summ. J. at Ex. 1(P-23).)  Pepper accommodated him after April 2012, and thus could not have retaliated against him by imposing those essential functions.  Fischer's retaliation claim is accordingly dismissed.

BY THE COURT

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J

36